Acheson, Circuit Judge.
In the fall of 1887 the defendants, under the name of the Anchor Remedy Company, engaged, and have since continued, in business, at the city of Pittsburgh, as manufacturers and vendors of proprietary medicines of their compounding, marking their labels, wrappers, and bottles with their business name, and with the representation of a black anchor, and designating their compounds “Anchor Liniment,” “Anchor Rheumatic Remedy,” etc. In adopting this name and symbol the defendants acted in good faith, believing such use to be original with them. Their labels, wrappers, and packages have been always distinctly marked “Prepared by the Anchor Remedy Company, Pittsburgh, Pa.” “ Laboratory, corner Liberty and Fourth streets, Pittsburgh, Pa.” The plaintiff, Dr. F. Ad. Richter, a citizen and resident of Germany, by his bill, filed November 13, 1890, seeks to restrain the defendants “ from selling proprietary medicines having thereon any labels, or wrapped in any wrappers, or contained in any bottles, having printed, blown, or otherwise applied the word ‘Anchor,’ or the pictorial representation of "an anchor, and from using the word ‘Anchor ’ as part of their firm name, or the pictorial representation of an anchor in any connection whatsoever in their said business.” In effect, the plaintiff claims an exclusive right to use in the United States the word “Anchor,” and the symbol of an anchor, in connection with the manufacture or sale of medical compounds.
The bill, which describes the plaintiff as “a citizen of the empire of Germany, doing business as F. Ad. Richter & Co., in the city, county, and state of New York,” sets forth that he has been engaged in the city of New York, “for a number of years last past,” in the sale of proprietary medicines manufactured at his factory; and that, about the year 1869, *456 “your orator, being so engaged in the sale of proprietary medicines, adopted, applied, and used, as a trade-mark of certain proprietary medicines of his manufacture, the pictorial representation of an anchor, and the word symbol ‘Anchor,’ which trade-mark or emblem was by him applied and used by printing upon labels, blown into bottles, and otherwise;” and that the same was registered on July 23, 1889, in the United States, agreeably to the act of congress. The proofs show that the plaintiffs factory is at Rudolstadt, Germany, where his goods are and always have been manufactured, marked, labeled, and put up for the market. All the plaintiff’s medical compounds—of which we have before us many specimens—are unmistakably German preparations, with printed labels, directions, etc., thereon in that language, although having also labels in English; and they are all distinctly marked, “Manufactured by E. Ad. Richter & Co.”
The bill, it will be perceived, is quite indefinite as to the length of time the plaintiff had been engaged in the city of New York in the sale of his medicines before this suit was brought. Nor do his proofs certainly fix the date when his branch saleshouse was established in that city. It was, undoubtedly, after May 1, 1887, for Charles Bernhart Drugulin, who opened that house for the plaintiff, did not leave Rudolstadt until that date. Prior to that time the plaintiff had no establishment in the United States. Neither had he ever sold any of his ■medical compounds in this country before he opened his New York branch house. It is true there had been previously some importations, to a limited extent, into the United States of the plaintiff’s medicines, but by druggists and others who sent orders for the medicines to Rudolstadt to supply persons who had lived in Europe, and there had used them.
Prior to his engaging in business in New York the plaintiff’s use of the word “Anchor” and symbol of an anchor was in the empire of Germany, and it is in evidence that he there registered the picture of an anchor as a trade-mark on May 1, 1875, for chemical pharmaceutical preparations and specialties, soaps, liquors, and other designated things; on February 25, 1876, for pharmaceutical preparations and specialties and other named articles; on February 25, 1878, for pharmaceutical preparations; on May 18, 1880, for chemical and pharmaceutical preparations of any kind, etc.; on June 7, 1880, for alcoholic drinks of any kind and other specified articles; and on March 7, 1885, for a number of things, including all kinds of toys for children, tobacco and tobacco fabrics; and the certificates before us show registered announcements at various dates of the further “retention” of the trade-mark. We have not been shown the law of the German empire in relation to trademarks, nor have we any evidence as to what rights, if any, the owner of a trade-mark there has outside of his registration.
As stated in the bill of complaint, on July 23, 1889, the plaintiff registered in the United States patent office, under the act of congress of March 3, 1881, an anchor trade-mark for medical compounds. But, as we have seen, that registry was long after the defendants had engaged in *457 their said business, and, indeed, after this dispute had arisen between them and the plaintiff, and this lawsuit had been threatened. A facsimile of the plaintiff’s trade-mark, as alleged to he used by him, accompanied his 1889 registered declaration, which latter contains the following statement:
“My trade-mark consists of the representation or picture of an anchor and the word symbol ‘Anchor.’ These have generally been arranged as shown in the accompanying facsimile, which contains, in an ornamental panel, two representations of an anchor in white upon a black groundwork, surrounded by a white border of oval shape, and the word symbol ‘Anchor,’ in connection with the words ‘ Pain Expeller,’ or other words relating to the medical compounds in connection with which the trade-mark is used; but the words •Pain Expeller,’ the color of the representation of the anchor, and the color and shape of the groundwork and surrounding border are immaterial, and the words ‘ Pain Expeller,’ and the border and special groundwork, may be omitted altogether without materially altering the character of my trade-mark. I prefer to use both the representation or picture of an anchor and the word symbol ‘Anchor,’ but the picture of an anchor may be used alone without materially affecting the character of my trade-mark, the essential feature of which is the picture or representation of an anchor. This trade-mark I have used continuously in my business since the 1st day of March, 1869, and it was registered for the German empire on the 20th day of May, 1875. ”
The said registered facsimile, besides the characteristics above mentioned, contains printed lengthwise along the face of the panel above the designation “Anchor Pain Expeller” the words “Genuine is only,” and below said designation the words, “Of Richter’s Manufactory.”
The defendants never used this facsimile, nor anything (aside from the word “Anchor,” and the symbol thereof) having the remotest resemblance to it. The plaintiff’s bill rests upon his registered trade-mark of 1889, and abo upon his supposed common-law right to the exclusive us® upon medical compounds of the word “Anchor” and its emblem. But the proofs reveal the important fact (undisclosed by the bill) that on July 7, 1885, the plaintiff, as the sole proprietor of the house of F. Ad. Richter & Co., registered in the United States patent office an anchor trade-mark declared of record to have been “adopted ” by him for his use as a “trade-mark for medical compounds,” which is much more limited in its scope than the registered trade-mark of 1889. His declaration in this 1885 registration contains the following statement, which is here inserted at length for the sake of comparison between it and his statement already quoted:
“My trade-mark consists of letters and words and an arbitrary symbol. These have generally been arranged as shown in the accompanying facsimile, which facsimile is a representation of a red anchor in a white oval space or field, with the words • Schntz-Marke ’ and ‘ Trade-Mark ’ on the oval border, of black or gray color, and the words ‘ Garantió de TAuthenticite ’ above the representation of the red anchor, and ‘ Beweis der Echtheit ’ below the representation of the red anchor, the whole being surrounded by a border of black or gray color, with small anchors in the corners; but the outside border may be omitted at pleasure, without materially altering the character of my trade-mark, the essential feature of which is the representation of a red anchor in the oval space or field. This trade-mark I have used continuously *458 in my business since the year 1869, and it was registered for the German empire on the 20th of the month of May, 1875. ”
It is not pretended that the defendants have infringed the rights of the plaintiff under his original United States registration. Neither can it he successfully maintained that by virtue of his second United States registration the plaintiff could acquire any new rights to the prejudice of the defendants in their previously established business. Nor do we perceive any good basis for the claim that, independently of his United States registrations, the plaintiff had acquired, as against the defendants, a common-law right to the exclusive use in the United States of the word “Anchor” and its symbol, in connection with the manufacture and sale of medical compounds. As we have seen, prior to his first registration, the plaintiff had never sold in the United States any of his medicines. Nor had he himself made any importations thereof before that registration. Having, then, no trade in this country, we do not see how the plaintiff could well have here a common-law trade-mark. Browne, TradeMarks, §§ 46, 54. To sustain the plaintiff's present pretensions in that regard, might, indeed, prove to be an embarrassing precedent, in view of the great number and variety of articles to which his anchor trademark as registered in Germany applies. But, furthermore, certainly a trade-mark may be abandoned, (Id. § 674,) and what clearer evidence of abandonment of the right to the unlimited use of the anchor emblem could there be than was furnished by the plaintiff’s restricted registration on July 7, 1885? He thereby gave public notice to all traders, and others, in the United States, that he adopted as his trade-mark for medical compounds, not the representation of an anchor generally, but “a red anchor in the [white] oval space or field.” This limited registration was the very deliberate act of the plaintiff, and he must abide the consequences. It would be a perversion of the right to registration under the act of congress, of which the plaintiff availed himself, and would amount to a fraud on other traders, to permit the plaintiff now to assert broader rights in the anchor as a trade symbol than his public registry in 1885 disclosed. True, section 10 of the act declares “that nothing in this act shall prevent, lessen, impeach, or avoid any remedy, at law or in equity, which any party aggrieved by any wrongful use of any trademark might have had if the provisions of this act had not been passed.” But the act requires that the application for registration shall be accompanied by a written declaration, verified by the applicant, that the description and facsimile presented for registry truly represent the trademark; and section 10 gives no countenance to the idea that a person, availing himself of the benefits of the act, may register as his trade-mark a peculiar representation of a common emblem, exhibiting special and distinguishing features and a particular combination, and yet afterwards claim the emblem pure and simple, without regard to such features or combination. To tolerate this would be to defeat the very purpose of the act.
We have only to add here that all specimens of the plaintiff’s goods before us as exhibits have impressed thereon his red anchor symbol, and *459 it is a conspicuous and distinguishing sign. But then, again, the defendants’ medical compounds in themselves are unlike in appearance those of the plaintiff, and their labels, wrappers, and phials, in size, color, and general effect, are widely different from his. We are altogether convinced, not only by the testimony, but by our own inspection, that the defendants’ goods as put upon the market are so easily distinguishable from those of the plaintiff that no purchaser or consumer using the slightest attention could mistake the one for the other. It is not shown that any one has ever been misled. The defendants’ labels, indeed, point directly and unequivocally to proprietorship and origin. And, finally, we do not find in this record a particle of evidence tending to convict the defendants of any attempt or purpose to deceive the public orto perpetrate a fraud upon the plaintiff.
In Desmond’s Appeal, 103 Pa. St. 126, the supreme court of Pennsylvania held that the appropriation, as a trade-mark applied to compound medicines, of the word “Samaritan” in one combination of words, did not prevent its being used in other combinations; and hence that the use by the defendants of the name “ Samaritan’s Nervine” did not violate the plaintiff’s trade-marks “Samaritan’s Gift” and “Samaritan’s Root and Herb Juices.” The same learned court in Heinz v. Lutz, 146 Pa. St. 592, 609, 23 Atl. Rep. 314, declared that “a court of equity will not restrain a person from using a device, on the ground that it infringes plaintiff’s trade-mark, unless it is so similar in appearance that any person using such reasonable care and observation as the public generally are capable of using, and may be expected to exercise, would mistake the one for the other;” citing Gilman v. Hunnewell, 122 Mass. 139, and Desmond’s Appeal, supra. And this doctrine was distinctly approved by the supreme court of the United States in Manufacturing Co. v. Trainer, 101 U. S. 51, 56. Upon the whole case, then, we are of the opinion that the plaintiff is not entitled to equitable relief.
Let a decree be drawn dismissing the bill of complaint, with costs.
Buffington, District Judge, concurs.